IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VALERIO LOPEZ, et al.                  :

                                       :

      v.                               :    Civil Action No. DKC 08-1579

                                       :

NTI, LLC, et al.                       :

                                       :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Fair Labor Standards Act case are two motions: (1) a motion for summary judgment filed by Defendants XTEL Construction Group, LLC and Mike Bahmani (Paper 87) and (2) a motion for testimony in open court by contemporaneous transmission filed by Plaintiffs (Paper 70). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendants' motion for summary judgment will be denied, while Plaintiffs' motion for testimony by contemporaneous transmission will be granted in part and denied in part.

I.    **Background**

      A.    **Factual Background**

According to Plaintiffs' first amended complaint, Verizon Communications, Inc. ("Verzion") began construction on a new fiber-optic service network in 2004. (Paper 15-1 ¶ 22).

Verizon contracted with Defendant NTI, LLC ("NTI") to perform work on the project, such as digging trenches and laying fiber-optic cable conduit. (*Id.*). NTI then contracted with several subcontractors, including Defendant XTEL Construction Group, LLC ("XTEL"), to obtain "manpower" to complete the jobs. (*Id.* ¶ 23). XTEL and NTI, "as employers or joint employers," subsequently hired Plaintiffs to provide unskilled labor on the project. (*Id.* ¶ 24).

Plaintiffs contend that they contracted with NTI and XTEL for pay on a "piece rate basis." (*Id.* ¶ 34). Under the purported agreement, Plaintiffs were to be paid according to the number of feet of trenches they dug each day, multiplied by "a fixed sum ranging from $2.40 to $2.60, and . . . divided among the employees present on a given day." (*Id.*). Plaintiffs allege that Defendants were supposed to pay them weekly. (*Id.*).

Plaintiffs maintain that Defendants failed to hold up their end of the bargain. In particular, Plaintiffs aver that Defendants sometimes paid Plaintiffs for fewer feet than they actually dug and, on some weeks, neglected to pay at all. (*Id.* ¶ 35). Defendants forced Plaintiffs to perform uncompensated menial labor on Saturdays. (*Id.*). Defendants required Plaintiffs to report for work each day, but sometimes sent them home without work or compensation. (*Id.* ¶ 36). Defendants

would dock hours if Plaintiffs damaged utility pipes while digging. (*Id.* ¶ 40). And Defendants allegedly deducted $50 per week from Plaintiffs' paychecks without their consent in exchange for housing that Defendants provided. (*Id.* ¶ 37).

**B. Procedural Background**

Plaintiffs filed their initial complaint against seven defendants on June 17, 2008 (Paper 1), with an amended complaint following on August 29, 2008 (Paper 15-1). Those complaints alleged that the seven defendants failed to pay Plaintiffs minimum wage for the hours they worked and overtime wages for hours worked in excess of 40 hours a week. Plaintiffs sought recovery for breaches of their employment contracts and violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, the Maryland Wage & Labor Law, Md. Code Ann., Lab. & Empl. §§ 3-401 to -431, and the Maryland Wage Payment and Collection Law, *id.* §§ 3-501 to -509. Plaintiffs later voluntarily dismissed their claims against four of the original defendants. (Papers 13 & 82).

On December 9, 2008, Plaintiffs, NTI, and ten opt-in claimants not party to the lawsuit jointly moved for approval of a settlement and entry of a consent decree ("the Decree"). (Paper 34). Under the Decree, Plaintiffs and the opt-in claimants received $105,000 from NTI "in full satisfaction of

all claims, damages, costs and attorneys' fees related to this Lawsuit."[1] (Paper 34-1 ¶ 3.01). The Decree also provided that the obligation to make payments under the agreement "shall apply to and be binding only upon NTI LLC and is not guaranteed or secured by any other entity or individual." (*Id.* ¶ 2.05). The court issued an order approving the settlement on December 11, 2008 (Paper 35) and signed the Decree one day later (Paper 36). After five months, Plaintiffs filed an order of satisfaction noticing that NTI had satisfied its obligations under the Decree. (Paper 86).

Now, only Defendants XTEL and Mike Bahmani, XTEL's owner, remain.

On April 15, 2009, the court approved the parties' proposed discovery schedule (Paper 55), under which discovery was to close on August 17, 2009 (Paper 54). After several requested extensions from the parties over the following months, the court ordered that written discovery and depositions would be complete by November 30, 2009. (Paper 66). Plaintiffs' filed their motion for testimony in open court by contemporaneous transmission on October 22, 2009 (Paper 70),

---

[1] The consent decree defines "Lawsuit" as "[t]his action, *Lopez, et al. v. NTI, LLC, et al.*, No. 8:08-cv-01579-DKC (D. Md.)." (Paper 34-1, at 3).

while Defendants waited until June 24, 2010 to file their motion for summary judgment (Paper 87).

## II.  Defendants' Motion for Summary Judgment

### A.  Standard of Review

The standards on summary judgment are familiar.  A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  In other words, if there are clearly factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

On a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  *Celotex*, 477 U.S. at 323.  "[A] complete failure of proof concerning an essential element . . . necessarily

renders all other facts immaterial." *Id*. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 254; *Celotex*, 477 U.S. at 324. "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50. (citations omitted).

**B.    Analysis**

**1.    Timeliness of Defendants' Motion**

At the outset, Plaintiffs contend that the court should not consider Defendants' motion because it was filed almost six months after the presumptive deadline for summary judgment motions. (Paper 90, at 7). Federal Rule of Civil Procedure Rule 56(c)(1)(A) states that, where no local rule or court order otherwise applies, "a party may move for summary judgment at any

time until 30 days after the close of all discovery."[2] Plaintiffs protest that Defendants filed their motion on June 24, 2010, 206 days after the deadline for written discovery and depositions.

Tardy motions are not to be encouraged, but Plaintiffs have not shown, or even attempted to show, that Defendants acted in bad faith[3] or that the late filing would somehow prejudice Plaintiffs. Plaintiffs concede that they have been aware of the grounds for Defendants' arguments since November 2009. (Paper 90, at 7). *See Pine Ridge Coal Co. v. Local 8377, United Mine Workers of Am.*, 187 F.3d 415, 419 (4th Cir. 1999) (affirming lower court's consideration of summary judgment motion where opposing party "received ample notice of the motion"). The parties in fact addressed these very issues in the context of Plaintiffs' motion for contemporaneous transmission, discussed below. (Paper 75, at 2-3; Paper 76, at 1-4). The court has

---

[2] This court typically sets a dispositive motion deadline 30 days after the close of discovery. In this case, however, the schedule was proposed by the parties in their status report of April 14, 2009, and did not include a separate deadline for dispositive motions. Papers 54 and 55.

[3] The circumstances suggest that Defendants acted in good faith. Defendants note that full payment of the $105,000 mandated by the Decree is the basis for their summary judgment motion. (Paper 92, at 2). Plaintiffs did not enter the order demonstrating that full payment was made until a month before Defendants filed their motion for summary judgment. (Paper 86).

also had more than sufficient time to consider Defendants'
motion, despite the delay. *See United States v. Savoy*, 38
F.Supp.2d 406, 410 n.2 (D.Md. 1998) (declining to dismiss
untimely motion where court had sufficient time to consider it).
In light of all these circumstances, the court will consider the
merits of Defendants' motion. *See United States v. Johnson*, 953
F.2d 110, 116 (4th Cir. 1991) ("Motions filed out of time are
accepted at the discretion of the trial court."); *Brumback v.
Callas Contractors, Inc.*, 913 F.Supp. 929, 934 (D.Md. 1995)
(entertaining untimely motion for summary judgment because
"notions of judicial economy and fairness militate against a
harsh response").

### 2. Merits of Defendants' Motion

Defendants' motion, however, fails on its merits.
Concededly, Defendants' motion presents a facially
straightforward chain of logic. According to Defendants,
employee-plaintiffs in an FLSA action are "prohibited from
entering into a settlement for less than the full amount of
their wage claims." (Paper 87-1, at 8). Here, Defendants note,
there was a court-approved settlement, so Plaintiffs must have
received the full value of their wage claims. (*Id.* at 8-9).
Because NTI and Defendants were joint employers, and one joint
employer can "take credit" toward the wage requirements for

payments made by other employers,[4] Plaintiffs cannot recover anything more from Defendants. (*Id.* at 9-10). Although straightforward, Defendants' logic fails because it rests on a faulty premise: the FLSA does not prohibit employee-plaintiffs from entering into a "less than full value" settlement in every situation, at least when the settlement is judicially supervised.

To understand where Defendants' argument goes awry, some history is needed. Congress originally enacted the FLSA "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)). Under the Act, "there is a judicial prohibition against the unsupervised waiver or settlement of claims." *Taylor v. Progress Energy, Inc.* ("*Taylor II*"), 493 F.3d 454, 460 (4th Cir. 2007) (citing *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 114-16 (1946)). Courts implemented this prohibition out of concern that the "inequality of bargaining power" between employer and employee could result

_____

[4] This principle is similar to the "one satisfaction rule" often seen in cases involving joint tortfeasors. *Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 737 (4th Cir. 2000).

in settlements for less than the statutory minimums. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 708 (1945). Allowing private settlements for less than the statutory minimums would frustrate the statute's objectives, while allowing employers to use "settlement discounts" to evade the FLSA. *Taylor II*, 493 F.3d at 460. Settlement, however, is not entirely forbidden in FLSA cases; "[c]laims for FLSA violations can, of course, be settled when the settlement is supervised by the [Department of Labor] or a court." *Taylor v. Progress Energy, Inc.* ("*Taylor I*"), 415 F.3d 364, 374 (4th Cir 2005); *see also Poulin v. Gen. Dynamics Shared Res., Inc.*, No. 3:09-cv-00058, 2010 WL 1655962, at *2 (W.D.Va. Apr. 23, 2010) ("FLSA claims can be waived by either of the two statutory exceptions to the general rule against waiver.").

Defendants cite two cases discussing the prohibition against *private* settlements for the proposition that *judicially supervised* settlements are possible only where an employer pays all of an employee's wage claims. (Paper 87-1, at 7-8 (citing *Brooklin Sav. Bank*, 324 U.S. 697; *Roland Elec. Co. v. Black*, 163 F.2d 417, 421 (4th Cir. 1947)). Put differently, in Defendants' view, even judicially supervised settlements can involve no element of compromise or dispute. That view is incorrect. Courts have consistently recognized that judicially supervised

FLSA settlements rest on a different footing than privately orchestrated ones, such that judicially supervised settlements may resolve -- in some circumstances -- genuine disputes for less than "full value."

The Supreme Court first considered compromise and settlement in the FLSA context in *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945). In *Brooklyn Savings*, two employers attempted to pay their employees back wages in exchange for a release of the employees' rights (such as the right to seek liquidated damages) under the Act. *Id.* at 700-03. There was no bona fide dispute between the parties as to liability and the waivers were obtained without court involvement. *Id.* at 704. Thus, the question was whether employees could independently waive their rights under the FLSA in the absence of any bona fide dispute over liability. *Id.* The Court concluded that they could not, as to do so would "nullify the purpose of the Act." *Id.* at 707. The Court expressly refused, however, to decide "what limitations . . . the Act places on the validity of [settlement agreements] . . . if the settlement is made as the result of a bona fide dispute between the two parties, in consideration of a bona fide compromise and settlement." *Id.* at 714.

A partial answer to the question left open in *Brooklyn Savings* came a year later in *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108 (1946). *Schulte* held that "the remedy of liquidated damages cannot be bargained away by bona fide settlements of disputes" over coverage. *Id.* at 114. But in dicta the Court noted that it did not decide whether a settlement was possible when there was a bona fide dispute over the degree of liability or amount. *Id.* And it suggested that settlements implemented through stipulated judgments presented different considerations than private agreements:

> Petitioner draws the inference that bona fide stipulated judgments on alleged Wage-Hour violations for less than the amounts actually due stand in no better position than bona fide settlements. Even though stipulated judgments may be obtained, where settlements are proposed in controversies between employers and employees over violations of the Act, by the simple device of filing suits and entering agreed judgments, we think the requirement of pleading the issues and submitting the judgment to judicial scrutiny may differentiate stipulated judgments from compromises by the parties.

*Id.* at 113 n.8. The United States Court of Appeals for the Fourth Circuit construed this dictum to imply, at the very least, "that the rule of the *Schulte* case would not apply to stipulated judgments." *Bracey v. Luray*, 161 F.2d 128, 130 (4th Cir. 1947).

12

Perhaps because of the two critical caveats found in *Schulte*, later "courts of appeals dismissed the argument that [*Brooklyn Savings* and *Schulte*] somehow forbade voluntary compromises, executed pursuant to consent judgments, with respect to sums the amount of or liability for which was disputed." *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 860 (5th Cir. 1975) (listing cases); *cf. Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 305 (7th Cir. 1986) (explaining, in context of Department of Labor supervised settlement, that "a settlement is a compromise — the employee surrenders his opportunity to get 100 cents on the dollar, in exchange for a smaller payment with certainty"). As the United States Court of Appeals for the First Circuit explained:

> [The *Schulte* dicta] indicates clearly that the Supreme Court . . . was not prepared to go so far as to close the door completely and finally on the possibility of settling genuine disputes arising under the Fair Labor Standards Act short of payment in full of minimum wages, overtime compensation and liquidated damages, thereby in effect forcing employees to take the risks however great and submit to the delays however long involved in litigating every honestly disputed question which might arise under the Act. It seems to us instead that the Supreme Court in the statement quoted above must have meant to indicate that it was disposed to permit employees, at least when acting as free agents honestly and fairly advised, and when paid minimum wages and overtime compensation in full, to settle such genuine disputes with their employers

> . . . provided such settlement receives the
> judicial approval implicit in the entry of a
> consent judgment.

*Urbino v. P.R. Ry. Light & Power Co.*, 164 F.2d 12, 14 (1st Cir.
1947).  Congress itself spoke to the issue in the Portal-to-
Portal Pay Act of 1947, which provided that FLSA claims that
accrued prior to 1947 "may hereafter be compromised in whole or
in part, if there exists a bona fide dispute as to the amount
payable by the employer to his employee."  29 U.S.C. § 253(a).

When determining whether to approve a settlement, courts
typically assess the settlement for reasonableness, often using
the rubric suggested in *Lynn's Food Stores, Inc. v. United
States*, 679 F.2d 1350 (11th Cir. 1982).  *Lynn's Food Stores*
suggests that an FLSA settlement should be approved if the
settlement "does reflect a reasonable compromise over issues,
such as FLSA coverage or computation of back wages, that are
actually in dispute."  *Id.* at 1354; *see also Lomascolo v.
Parsons Brinckerhoff, Inc.*, No. 1:08cv1210, 2009 WL 3094955, at
*8 (E.D.Va. Sept. 28, 2009) ("'If the proposed settlement
reflects a reasonable compromise over contested issues,' the
settlement should be approved.") (quoting *Lynn's Food Stores*,
679 F.2d at 1354).  In contrast to Defendants' all-or-nothing
approach, *Lynn's Food Stores* and similar cases recognize a role
for less-than-full-value compromise in the FLSA settlement

14

process.  *See, e.g., Alleyne v. Time Moving & Storage Inc.*, 264 F.R.D. 41, 57-58 (E.D.N.Y. 2010) (approving settlement of FLSA claims at 13-17% of maximum recovery).  These compromises reflect the "many factors [that] may be in play as the parties negotiate," including disagreements over "the number of hours worked by the plaintiff, the plaintiff's status as an exempt employee, or the defendant's status as a covered employer." *Bonetti v. Embarq Mgmt. Co.*, No. 6:07-cv-1335-Orl-31GKJ, 2009 WL 2371407, at *4 (M.D.Fla. Aug. 4, 2009).

In summary, prior Supreme Court decisions, "60 years of practice, and the FLSA amendments of 1949 all lead to the conclusion that settlements of bona fide disputes over hours worked or compensation due are enforceable under some circumstances." *Hohnke v. United States*, 69 Fed.Cl. 170, 175 (2005).

In light of the foregoing, the court cannot say that the prior settlement covered all of Plaintiffs' wage claims as a matter of law.[5]  Defendants have not cited any case, and the court has been unable to locate any case, that finds that a consent judgment against one joint employer necessarily bars any remaining claims against all other joint employers.  Indeed, at

---

[5] Defendants have not argued as a factual matter that the $105,000 paid by NTI would set-off and reduce Plaintiffs' recovery against Defendants to nothing.

least one court held directly to the contrary. *See Wood v. Meier*, 218 F.2d 419, 420 (5th Cir. 1955) (rejecting argument that "the effect of . . . obtaining judgment against one of the joint obligors was to merge the entire cause of action into that judgment so as to bar further proceedings against [the other joint employers]").

The language of the Decree does not alter the court's decision. The preclusive effect of a consent judgment is determined by the intent of the parties. *Keith v. Aldridge*, 900 F.2d 736, 740 (4th Cir. 1990). The intent of the parties in this case is clear: NTI was the only defendant party to the Decree (Paper 34-1, at 2), Plaintiffs agreed not to bring any further claims against NTI (*id.* ¶ 2.03), the Decree applied to and was binding upon only Plaintiffs and NTI (*id.* ¶ 2.05), the Decree addresses dismissal only as to NTI (*id.* ¶ 3.05), the Decree discharged only NTI (*id.* ¶ 4.01), and constituted a "final settlement of all claims" against only NTI (*id.* ¶ 6.01). Given all of these limitations, the court cannot agree with Defendants' apparent reading that the Decree was meant to apply to all claims against all parties to the present dispute. Defendants' motion will be denied.

### III. Plaintiffs' Motion for Testimony in Open Court by Contemporaneous Transmission

Plaintiffs have moved for an order permitting certain Plaintiffs residing in Honduras, Tennessee, and Virginia to testify via "contemporaneous transmission" (Paper 70), namely videoconferencing. In support, Plaintiffs note the difficulty of securing a visa from Honduras and the substantial expense of travel. Defendants oppose, arguing that (1) the non-resident Plaintiffs need to be in the courtroom to establish their identity, (2) the use of videoconferencing would impede central credibility determinations, and (3) financial considerations weigh in favor of Defendants, not Plaintiffs.

Federal Rule of Civil Procedure 43 governs the taking of testimony at trial. That rule expressly provides for the possibility of videoconference testimony, stating that "[t]he court may, for good cause shown in compelling circumstances and upon appropriate safeguards, permit presentation of testimony in open court by contemporaneous transmission from a different location." Fed.R.Civ.P. 43(a). Although Rule 43 provides some flexibility in accepting remote testimony, it seems obvious that remote transmission is to be the exception and not the rule. *See* Fed.R.Civ. P. 43 advisory committee's note on 1996 amendments ("The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the

presence of the factfinder may exert a powerful force for truth telling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition."). Courts have also recognized that, even with the benefits that technology provides, substitutes for live testimony are necessarily imperfect:

> Videoconference proceedings have their shortcomings. Virtual reality is rarely a substitute for actual presence and . . . even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it. The immediacy of a living person is lost with video technology. . . . Video conferencing . . . is not the same as actual presence, and it is to be expected that the ability to observe demeanor, central to the fact-finding process, may be lessened in a particular case by video conferencing. This may be particularly detrimental where it is a party to the case who is participating by video conferencing, since personal impression may be a crucial factor in persuasion.

*Thornton v. Snyder*, 428 F.3d 690, 697 (7th Cir. 2005) (quotations and citations omitted).

Despite videoconferencing's deficiencies, courts in this circuit and elsewhere have approved or affirmed its use in the civil context. *See generally Rusu v. INS*, 296 F.3d 316 (4th Cir. 2002) (asylum proceeding); *United States v. Baker*, 45 F.3d 837 (4th Cir. 1995) (civil commitment hearing); *Edwards v. Logan*, 38 F.Supp.2d 463 (W.D.Va. 1999) (civil rights action); *see also In*

*re Merck Prods. Liab. Litig.*, 439 F.Supp.2d 640, 642 (E.D.La. 2006) (listing cases). These cases reflect a "consistent sensitivity to the utility of evolving technologies that may facilitate more efficient, convenient, and comfortable litigation practices." 9A Wright & Miller, *Federal Practice & Procedure* § 2414 (3d ed. 2008). And while videoconferencing has its shortcomings, it at least appears to be favorable to alternative methods, such as the submission of written deposition testimony. *Sallenger v. City of Springfield*, No. 03-3093, 2008 WL 2705442, at *1 (C.D.Ill. July 9, 2008).

In this case, Plaintiffs have demonstrated good cause as to those Plaintiffs residing in Honduras. The cost of international travel can provide good cause for contemporaneous transmission of testimony. *See, e.g., Dagen v. CFC Grp. Holdings*, No. 00 Civ. 5682, 2003 WL 22533425, at *2 (S.D.N.Y. Nov. 7, 2003). In some cases, travel cost and inconvenience have justified contemporaneous transmission even when the parties where located within the United States, in contrast to the internationally resident Honduran Plaintiffs in this case. *See, e.g., Beltran-Terado v. INS*, 213 F.3d 1179, 1186 (9th Cir. 2000) (affirming use of telephonic testimony for hearing in California where witness was in Missouri); *Scott Timber, Inc. v. United States*, No. 05-708C, 2010 WL 2947090, at *1 (Fed.Cl. July

19

28, 2010) (approving use of videoconferencing for trial in Washington, D.C., where witness was in Oregon); *Fed. Trade Comm'n v. Swedish Match N. Am., Inc.*, 197 F.R.D. 1, 2 (D.D.C. 2000) (finding good cause for videoconferencing where witness was in Oklahoma and hearing was in Washington, D.C.). Forcing the Honduran Plaintiffs in this case to travel to the United States would impose substantial inconvenience and cost on persons with strikingly few financial resources. (Paper 76-1). When viable alternatives like videoconferencing are available, compelling individuals who make no more than $7,000 a year to travel hundreds of miles seems fundamentally unjust. And although the court sympathizes with Defendants' claim that this litigation has already imposed substantial costs on them as well (Paper 75, at 4-5), those costs do not justify imposing needless expense on Plaintiffs.

The use of videoconferencing for the Honduran Plaintiffs will not prejudice Defendants. Each of the witnesses will testify in open court, under oath, and will face cross-examination. Even if Defendants are correct that this case presents complicated issues (Paper 75, at 3), the protections of the oath and cross-examination will provide them with the tools necessary to resolve those issues. With videoconferencing, a jury will also be able to observe the witness' demeanor and

20

evaluate his credibility in the same manner as traditional live testimony. Indeed, one judge who presided over two hearings using videoconferencing has concluded that "there is no practical difference between live testimony and contemporaneous video transmission." *Swedish Match*, 197 F.R.D. at 2; *see also Scott Timber*, 2010 WL 2947090, at *1 (observing that videoconferencing does not have a "significantly adverse effect" on factfinder's ability to make credibility determinations).

Plaintiffs' motion is not limited to the Honduran Plaintiffs; it requests an order permitting contemporaneous transmission of testimony for all Plaintiffs "outside a 100 mile radius of this Court." (Paper 70-2). Although Plaintiffs have shown good cause as to the Honduran Plaintiffs, good cause has not been shown as to the remaining Plaintiffs. Plaintiffs do not address the Plaintiff residing in Richmond, Virginia anywhere in the motion papers, and the court cannot discern any reason why the Richmond Plaintiff would be unable to attend. The court is also unconvinced that the financial expense of travelling from Tennessee merits videoconferencing for that witness. Therefore, Plaintiffs' motion will be denied as to those two witnesses.

In sum, Plaintiffs have shown good cause for contemporaneous transmission of the testimony of those

Plaintiffs currently residing in Honduras. Those Plaintiffs are Marvin A. Mejia, Jesus Orellana, Victor Perez, Juan Pineda Gonzalez, Josue Roberto Pineda, Nery Armando Pineda, and Oscar Pineda. The Plaintiffs have not shown good cause as to any other Plaintiff.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be denied and Plaintiffs' motion for testimony in open court by contemporaneous transmission will be granted in part and denied in part. A separate order will follow.

_____/s/_____<br>
DEBORAH K. CHASANOW<br>
United States District Judge